Good morning, Your Honors. May it please the Court, my name is William Weiner and I'm appearing for the Petitioner-Appellant Pham. I'd like to reserve about three minutes for my rebuttal, if I can. And I also would like, if possible, to talk about three issues, the Bruton linkage issue, the testimony issue, the second issue that I raised in my brief, which is the distrust accomplice testimony issue, and lastly, one of the many IAC issues raised. On the Bruton linkage issue, it's true that the redacted Hua Nguyen statement did not specifically mention Pham. There's no question about that. He never was mentioned and instead what was mentioned was he did things with others, others carried guns and so forth. There's no question about that. But when you look at his statement and you When you say his statement, you Hua Nguyen's statement, which was repeated by Officer McLaren. Officer McLaren testified to a co-defendant's statement. Right. It was Hua Nguyen's. That statement was redacted because that defendant did not testify. Right. Okay. I'm sorry. I'm just trying to get the name of the witness, which was Hua Hua Nguyen. Last name is Nguyen. I'll just call him Nguyen and I think that will make it easier. So the evidence that preceded it, in conjunction with Nguyen's redacted statement, just as much as naming Pham absolutely fingered him, identified him and implicated him. You have to remember that the prosecution's case was virtually complete at that point in time. The only witness left to testify after Nguyen's redacted statement came in was an expert witness on home invasions. So everything else had come in in the prosecution's case. What you had was the two victims testify. The one victim, Vo, testified at first that Pham was the guy who was beside him at the car and he got a real good look at him. And right in the middle of his testimony at trial, he said, no, no, that's right. That's not the guy. That guy is not here. Pham was the guy who was running out of the house that I only got a fleeting glance of. This man not only changed his testimony, he also testified that two of the defendants he identified them in a photo lineup and identified them in trial, but they were acquitted. So his testimony was pretty much rejected in terms of I.D. Ha Pham was the second victim who testified. She clearly said that Pham was the guy who was upstairs with her. There's no question about it. But what she also said is important. She said that all the defendants were 20 years old or less. She said all of them for sure was Vietnamese. She's Vietnamese. And she said she can tell when someone is only half Vietnamese. She said he was dark-skinned. She said he had black hair. Because it turns out that Pham is half Vietnamese and half Hispanic. It also turns out that he's 26, actually the only one who was 26. The others are 20 or below. It turns out he has brown hair, not black hair, and he's light-complected. So her testimony in terms of identification from my point of view was somewhat sketchy. The real testimony that came in was testimony by police officers to what co-defendants said before trial, to their statements. First you had the juvenile testify. This is Sau Chau. The names get confusing. I'll call him the juvenile. So the juvenile testified by himself. And he testified for Pham in the sense that he testified in favor of Pham. He said, no, Pham wasn't involved. The others weren't involved. Instead, it was a guy named Minh and others from Stockton who he had committed the robbery with. But immediately, and he actually also said he gave a false statement to Sergeant Cavallo. And then Cavallo testified. And Cavallo said the juvenile, this guy Chau, had told him that they met at Sau Chau's apartment about 12 midnight. They left at about 3 in the morning. Pham, he called him Minh, planned the robbery. Minh gave him a gun. Minh and him went into the garage. Minh ran upstairs. Others ran after him. And then Minh doled out 40 bucks. No question that's what he said. And he also then said they dropped Minh off first and then went to Motel 6, which is important because Minh is found later on in the day. He's not found at Motel 6 where all the other co-defendants are found and arrested. The police then testified to exactly that. They go to Motel 6 on 925 in the morning. They arrest all the defendants there. And then later in the day, I'll spare the details, they arrest Pham near his home, go into his home, go into his pockets. Nothing to connect him to the robbery or to the co-defendants. So this is the evidence you have at this point. Then what comes in? What comes in is this redacted statement. And the redacted statement says that he was at Cao Cao's apartment with others. Another person planned the robbery. They rode around. They went into the garage. Another person had the gun. He went upstairs behind another person. They ran out of the building. And another person gave him $40. Now, at that point in time, I'm not sure we have a problem, and I'm not suggesting that. That was what occurred up to that point. But then this is what occurred. And this is the clincher for me. Trial counsel and the prosecutor had an agreement. The agreement was that prosecutor wasn't going to bring out the fact that the group dropped someone off, because what already came out was Pham wasn't there at the motel. Pham was near his home. Don't bring out the fact that they dropped someone off, because that would identify Pham as the person who was dropped off. It's logical. So they had that agreement. But the prosecutor, with the redacted statement in his hand, approached McLaren, the police officer testifying, and said, with regards to the redaction, who was dropped off the second time? He dropped someone off the first time. Who was dropped off the second time? Trial counsel at that point objects. Out of the presence of the jury, he says, wait a second, we had an agreement. It identifies Pham by location, if he's going to say someone was dropped off, and the linkage problem with Bruton. It literally does identify him, even more so because there's a second drop off, who the heck is the first one? Of course, it's Pham. The prosecutor says, don't worry, I'll cure the problem. And by the way, the prosecutor agrees, I did have that agreement with trial counsel. Now there's something else you should know here. This latter information comes in not because it convicts who a Nguyen. Remember, Nguyen's statement presumably is coming in to convict Nguyen. Whether he dropped someone off or not has nothing to do with convicting who a Nguyen. It has a lot to do with convicting my client. So why is he asking this question except that it implicates my client? He says, I'll cure the problem. He gets out there and he asks McLaren, okay, who was dropped off, not the first time, but the second time? Again, making it clear there was a first time and a second time. And McLaren says, the second time was a man named Ahn. Now, to me, that, of course, did not cure the problem. It actually exacerbated it. We know that it wasn't Ahn dropped off the second time. We know someone was dropped off the first time. We know that because Sal Powell said so, the juvenile, pardon me. And we also know it because of the facts the police testified to. He wasn't there at the Motel 6. He was basically at home. Kagan. Did the confession that we're talking about, which was the Nguyen's confession, Your Honor, did it say that there were two people dropped off, that people were dropped off twice? Yes. Yes, it did. And that's what was brought out. And that's aside from anybody going to the Motel 6. It's the people who didn't go to the Motel 6. Yes. There's no question that they went to the Motel 6. And actually, it was brought out, and I have it quoted. I took the time to quote it line by line, question by prosecutor, answer by McLaren. And the question is, were two people, basically, were two people dropped off, not the first time, but what about the second? Let me back up for a minute. I mean, this whole process of make, I mean, of rewriting somebody's statement in order to comply with a suggestion. As I understand, there's a suggestion the Supreme Court case says this is okay. There's no actual case holding it's okay. Is that right? You mean that redaction is okay? Redaction of this kind. I mean, there's this substitution sort of redaction. Well, you know, it's probably my co-counsel's argument here, but, no, I think, actually, the Court would permit a statement to be redacted, so as long as the defendant, in this case Pham's, name is not only not mentioned, but his existence is not mentioned. But is there a Supreme Court case in which this happened and where it was approved? As opposed to a case in which there was a more traditional type of redaction in which they said, well, if it would have been the other kind, it would have been okay. I see what you're saying. That's correct. They've always said this is not right, but this probably would be right. This is not right. Right, but there's no case actually upholding something like that. No, but the force and logic of the cases, again, this argues against me, but the force and logic of the cases clearly suggests that you can redact a statement and it would pass muster. Right, although I'm having a hard time seeing how it would ever work in any instance in which something was said that was actually detrimental to another defendant because I don't see why the sequence of the testimony is what matters. I mean, what the order is. I mean, why it would matter if the evidence came in after rather than before. I don't see how that would matter. Well, if you leave out the person's name, then the question is does it tie the person by what evidence preceded it. I understand that. I'm saying it seems to me it's almost silly because the difference between deleted and some guy doesn't seem to me to be one of constitutional significance if there's a way to tie either the deleted or the some guy person to the defendant who's complaining about it. Well, I agree with the Court as far as that goes, and my point is slightly different, and I'm agreeing with you, Your Honor, but my point is slightly different. Just changing it to the guy itself, I agree with you, doesn't change the problem. But it's worse here. They said the guy, but then they filled in these details, details which, when you connect it to the evidence that came before, does a couple of things. It corroborates Sal Powell's out-of-court statements to Covello. We don't know whether they're true. He says they're not true. Now, all of a sudden, we've got another out-of-court statement that sort of corroborates it, and it points itself at Pham, clearly at Pham. And then you get these questions by the prosecutor. I mean, in one fell swoop, he violates his agreement with the trial counsel, he implicates Pham, and he tells everybody that Pham was the first guy that was dropped off, again, that has nothing whatsoever to do with making Nguyen guilty. And the reason this is supposed to come in is basically to show the jury, hey, Nguyen confessed to the crime, so convict him. But instead, it comes in not for that purpose. It has nothing to do with that. It comes in to point the finger at Pham, and that's the only thing it actually does. The violation of the agreement with trial counsel does exactly that. It points at Pham. I'll move on to my next point. Kagan. Is the government arguing harmless error about this? May I argue harmless error? Is the government arguing harmless error? Yes. The government is arguing harmless error. I'm correct on this point. Do you want to address that? Yes. Thank you, Your Honor. On the harmless error, I tried to point out to the court, and I don't think I'm being overly zealous by saying that the eyewitness testimony in this case was sketchy at best. Literally, the first victim, though, there's no question he was a victim of a robbery. The question was, who was the robbers? Right in the middle of his trial testimony, maybe an hour and a half into it, after he firmly said that Pham was the guy standing right by his side and he had a great look at him right by the side of the van, changed his testimony and said, no, I'm wrong about that. He didn't change it because somebody was dashing over him in cross-examination. He actually just changed it. He said, you know, I've made a mistake. It's not that guy. That guy's not in court. This guy, Pham, I think was one of the guys who ran out. He only got a fleeting glance at him. And remember, two of the people he did identify were acquitted. And the other thing, just for a minute, this is all a habeas case. Yes. We're faced with EDCA. We're faced with a very extensive and quite well-done district court opinion. Well, the question is, is it injurious to the verdict of the case? The only case that the prosecutor had, in my view, the heart of the prosecutor's case, were all cops repeating out-of-court statements. Sao Paolo's statement to Cavallo, this guy named Chung Do, again, a different name, statement to Overstreet, and of course the one we're now talking about, Nguyen's statement to McLaren, all of which are hearsay, all of which come into the cops. They all point the finger at Pham. The identification wouldn't have worked. The defendants were acquitted based on identification. It was just these statements. And this last statement, Nguyen's statement, corroborated, that's the point, it corroborated Sao Paolo, the juvenile defendant's statement, and at the same time pointed the finger at Pham. If I can go on to the next slide. You have Sao Paolo saying both things, so he sort of washes. Well, Sao Paolo is saying, he's not saying that he dropped off Pham, but he's saying he dropped someone off. Again, through Cavallo, he's saying he dropped someone off. And then the clincher is Nguyen, through this last few questions, through the cop who's testifying, McLaren, says, oh, yeah, we dropped off Ann in the second. So, of course, first is Pham. And, again, that was why the agreement was reached between the trial counsel. And the reason why this would hook up was because they knew from the cop's testimony that they only found Pham was not at the hotel. Pham was somewhere else. Absolutely. They knew that from the police officer's testimony, several police officers. It wasn't just one. There was no question about that. That wasn't in dispute as to where he was found. You have another issue, which you're going to have to talk about. That's my issue concerning the accomplice distrust in court live testimony. There's no exaggeration to say there are at least 20 instructions that I've cited in my brief which make that distinction. There was no objection, right? There was no objection. All right. There was no objection. And we're dealing again with AEDPA. I know you're dealing with AEDPA, but just think of what happened in terms of the structural error here. And if I might, and not make this here, no? No, no. We raised the issue and so forth. There's not that kind of default whatsoever. The issue is here and it's live before you. And it's very different than the Tarota case, which I'll get to in a moment. But I'd like to point out to Your Honors, when you were arguing the Perez case, which happened about an hour and a half ago, I noticed that you were focused on the credibility of witness Perez. And each and every one of you said, well, she didn't Not witness. Pardon me? Not witness Perez. She didn't testify. She didn't testify. All you had was a statement that was made out of court. You make the same distinction that the trial court made, that counsel make, that prosecutors make, that witnesses make, and that cops make. And that is there's live in-court testimony, and then there's statements made out of court. And the point I'm trying to make here is all the live in-court testimony from accomplices, Saochao's live in-court testimony, Doe's in-court testimony, and actually my client, Pham, who was an accomplice as well, all exculpated Pham. They all exculpated Pham. Had Doe exculpated Pham? His live testimony was he didn't commit the robbery and he doesn't know any of these people. So it didn't exculpate him, it just didn't? Well, he didn't. Okay. To that extent, it exculpated him. He never fingered him. But that's exactly what instruction was given. Sao gave a statement inculpating Pham. And that's when he got into court, for whatever reasons, he changed his testimony. And that is exactly why accomplice testimony is to be viewed with distrust. But the testimony, the live in-court testimony, was favorable. That's the only testimony to be viewed with distrust. They never said distrust out-of-court statements. I gather it's clear under California law at this point that it shouldn't have been done that way. There's no question it shouldn't have been done that way under California law. But what I'm suggesting to the Court, that this is different than Taroto, which I think maybe Judge Bey is talking about, it's not merely distrust accomplice testimony. You have to understand, and I've got 20 instructions here, that everybody said testimony is the witness testifying. Statements is what the witness said out-of-court. And it's the out-of-court statements that favored the prosecutor. It's the in-court testimony that favored Pham that's to be distrusted. The government points out, and I thought the argument had some force, that there were plenty of other reasons to not believe Sal as well. Well, there may be other reasons. Of course, I think Judge Bey was probably saying that he gave inconsistent statements. But an inconsistent statement instruction. So in terms of the harm of this, you know, inexact instruction, if they were already going to disbelieve him, why does it matter if they were disbelieving him for one more reason? We don't know if they were already going to disbelieve him. The inconsistent statement instruction clearly says you may consider inconsistent statements. Again, using the word statement for out-of-court testimony for in-court. That distinction is always used. Whereas the accomplished testimony says you shall distrust accomplished testimony. The live in-court testimony that favored Pham, you shall distrust it. There's a qualifier there as well, isn't there? There is no qualifier. I don't know what you mean. It says shall. But then doesn't it also say, but you can believe him if you want to? Oh, yes. I'm sorry. It says you should distrust it. That doesn't mean you have to reject it. Right, right, right. Yes, of course. But the difference is the inconsistent statement says you just look it out and look it in and make your own decision. You should view the testimony of an accomplice with distrust. This does not mean that you may arbitrarily disregard that. Exactly. Exactly. But you should view it with distrust. And lastly, I'm running out of time, so my rebuttal is gone. One IAC issue. I just wanted to, Your Honors, this is incredible. I've done this work for a zillion years. Actually, this is my last argument. I'm about to retire. I have never seen. That's too bad. I've never seen. Enjoy it. Thank you. A case like this in terms of trial counsel. No office. Never interviewed the defendant or his wife in an office or outside of a court proceeding. Drunk driving convictions. After the case was over, lost the files. He never made a motion. One single paper with his name on it was never filed in the case. Never returned a phone call. Never made a motion to suppress the identifications, which I have in there. It's a no-lose situation. If you lose it, so what? You gain information. Never made a motion to suppress the identification based on prejudice. Again, I have it in here as well. A no-lose situation. You can't. There's no downside to these motions. Everybody makes those motions. Didn't file anything. Never got an investigator. And the only issue I want to talk to, though, is he didn't investigate the alibi defense. It's the only defense that the defendant had. He was at another place. He was older than other people. He was. He had a girlfriend. I mean, the landlord at 2 o'clock. Exactly. That was an hour and a half before the robbery and six miles away. All we know now is that the landlord came home from work at 2 o'clock and saw the defendant in his sleeping clothes, which was a T-shirt and shorts, hanging out on the couch watching television. That should have been interviewed, could have brought it in. But he did speak to the wife, though. He did speak to the wife. And she didn't have an alibi test. When the case was on calendar, he never asked the defendant on the witness stand about the landlord. Not one question, even though he admits, he himself admits, this is not hearsay, in his declaration that Pham told him about the landlord. He admits that he never did anything about it. He never asked Pham about it on the witness stand. Hon Tran testified that she woke up about 3.30 sick and Pham got her some medicine. He never asked Pham that on the witness stand. I mean, how can a defense lawyer try a case when the only alibi his defendant has is that he was at home with his wife and the landlord was there? It wasn't lost on the prosecutor. The prosecutor's closing argument is, sure, he says that. His love interest is now his wife. His girlfriend then says that. Where's the landlord? Well, I'll tell you where the landlord was. The landlord was ready to testify, but nobody talked to the landlord. I agree, Judge Bay. He may have said it was 2 o'clock, but you have 2 o'clock, you have 3.30. All these are estimates. This is after the fact, seven, eight months after the fact. It would have buttressed his argument that he was home at the time when he was supposed to be at a robbery. Remember, he was supposed to be there at about 2 o'clock. He was supposed to be there at 12 o'clock when the planning took place. Then they left at about 3, and then they drove around. It's a defense that would have worked, and it's something that the prosecutor pounced on because no one brought in the landlord. It's the easiest thing to do. And remember, the trial counsel admits here that Pham did tell him about the landlord. The only reason he didn't go out and talk to him, he says, is because Hung Tran indicated, this is the girlfriend, now wife, that the landlord didn't want to get involved, which turns out not to be the case, and she denies that she said that. Okay. Thank you very much for your argument. It was very helpful. Thank you very much. Counsel. May it please the Court. Juliet Haley appearing for Pickman. I'm going to just begin sort of in the reverse order dealing first with the IAC claim. Notwithstanding Mr. Weiner's very quick, fast response characterizing this case as weak as it is, I think this case was dead on arrival. And I think that Mr. Mantel, having had 150 cases tried, given this because of his ability to turn cases around quickly, prepare for trial, did not have a lot to work with. His client refused to waive time, so he had to act quickly. He interviewed his client. His client denied all he had no idea why he was fingered. He knew none of these people, had never seen them before, nothing. So all of his complaints about why didn't he go over the probation report, I mean the police reports with him or go through the witnesses' statements, his client said he didn't know, have any idea, he'd never met any of these people. Complete innocence, non-involvement. He did tell him about the landlord. He said that the landlord had, on this alibi, had probably seen him around midnight or 1, but he said stay away from him.  So he told him. But the client says he didn't, so. Now the client says, you know, several years later with the declaration, that he said he denies that. One of the things I find. Just to back up a minute, when did the lawyer say this? The lawyer was asked about it when the superior court issued an order to show cause on these claims. 1999 or so. Yes. Okay. So the lawyer said, he told me to stay away from him. What's really interesting is on view, that guy that they dropped off, the statement that came in, guess who that is? He's the son of the landlord. Son of the landlord. Roommate of the defendant. And he's the one who, why the probation search that happened a week before this occurred. That's where the picture came from. So does it ring true that you'd say stay away? I mean if I'm the prosecutor and you bring in a landlord, which does not add to this defense. In fact, it contradicts the testimony of the petitioner and his girlfriend, that they were in bed asleep until she woke up at 3 a.m. or 3.30 with stomach morning sickness. You're going to have a landlord come in and say, oh, I actually saw him sitting up in his underwear in a white T-shirt, the same white T-shirt that he was identified with by the victim. And I'm going to find out, that's going to bring up, let's impeach you for some bias. I think the en vue participant is going to put a total lie to the petitioner's argument that he doesn't know these people and has no idea how they came up with his name. Never mind the fact that after his co-defendants implicated him in statements to the police when they were initially questioned, they gave a photo lineup, and notwithstanding his characterization, the wife, the victim, who also shares the same name, went to the Motel 6, looked at all these guys, and said they kind of look like them, but I'm not sure, but the gunman's not there. Well, guess who wasn't there? A lot of people weren't there. There were probably 17 billion people not there. But the important person that wasn't there, who she did finally see, was in the lineup, was Mr. Pham. And he is, by Salse's statement, which he was then cross-examined on, the guy that went up into the bedroom, and she said is the one that held the gun on her. So, I mean, you just, you start putting this together, and, you know, he's attacking What about the Bruton statement? Bruton, I mean, direct quote, and we're, as this Court's well aware, we're following Supreme Court authority. Well, not exactly, but there is Ninth Circuit. Is there a Ninth Circuit case specifically upholding this? Well, what I, what I, no. The Supreme, as I understand the Supreme Court law, maybe I'm wrong, there's a case that says you can't do it this way, and you, you know, you could probably do it this other way. But there's no case actually upholding to do it this way. Is that right? This, it is an open question whether the substitution of personal pronouns. Right. In terms of it being the holding. It's dicta in gray. Okay. In gray, what they did was, that's the one you were saying, like, they just. Now, is there a Ninth Circuit case upholding it, where this actually happened and was, and was upheld? I think that the Ninth, there's Ninth Circuit, there's Ninth Circuit authority generally acknowledging the state of the law. Is there any case in which this happened and was upheld? In Marsh. Marsh v. Richardson. But in. I mean, in Marsh v. Richardson, the confession did not violate the rule in Bruton because the confession was, quote, redacted to eliminate not only the defendant's name, but any reference to his or her existence. Isn't that a ruling? Yeah. I'm not sure what your. Well, I mean, the question was, was there any Supreme Court. And I was asking the question because I didn't know the answer. I'm trying to find out, is there a case which is actually upheld? Maybe I'm confused about the precision of your question. The state of the law from the U.S. Supreme Court is that Bruton clearly was, right, it's the case that said that even if you have a limiting instruction, even though we generally think juries follow limiting instructions, you just can't do it when you've got two people sitting at the same defense table and both names are there. You can't do that. They can't follow the instruction just to apply that statement to one and not the other. Richardson said what's okay is to have, this is a quote of Richardson, or it's Gray quoting Richardson. Richardson placed outside the scope of Bruton's rule those statements that incriminate inferentially really clear. It doesn't matter. And you were saying, like, so you're always going to have all this evidence coming in, whether it comes in before, whether it comes in after. That's right. You are. Hopefully you'll have a lot of evidence, right, because you have to prove beyond a reasonable doubt that this guy did it. So it's not this argument about this inferential connection. What it's about is whether it's facially incriminating, the statement. And the problem in Gray was that they just had this piece of paper, which the jury saw, that said, that just had a. And explain to me, I mean, obviously the Supreme Court thinks there's a difference, but I don't understand what the difference is between deleted and some guy. And you would be in the good company, I think, of Judge Reinhart, I mean, excuse me, Scalia. No, but I'm serious. I just, I don't. No. Because in order to evaluate when it's okay and when it isn't, I need to know what distinction the Supreme Court is relying on. And whether the blank is a blank or whether it's filled in with a pronoun, I don't understand how that. I mean, the only thesis would be the following, that when the jury knows that something was left out, they're more likely to speculate about who it is. But obviously when it says this guy, they're still going to be speculating about who it is. So I don't understand the difference. I share the same challenge. I think that what I can say is that it was a 5-4 decision, and there was a concurrence pointing out exactly what you're saying, that it doesn't matter as long as it does not facially incriminate. That's what they said in Richardson, and the concurrence in Gray points out, it said, this is ridiculous. It's fine that it says redacted. That's not the point. However, what we do know is that when you're trying to go to the Supreme Court It's something that's critically dishonest about rewriting people's sentences when it isn't what they said. I mean, it's one thing to leave something out, but it's another thing to say he said this guy when he didn't say this guy. I think that what we know from Gray is that Gray said the U.S. Supreme Court did have a 5-4, and their majority opinion said when the jury is looking and you don't know you say me and delete, delete. And they look over and then they just see from the table, oh, there's delete, delete. And they're looking at that. And they don't say that when you say me and this guy and that guy. It's baffling. But they do say in Gray, right? They say it would be okay if they said me and the other guy and the other guy. They actually say that in Gray. It's a footnote because that wasn't the facts before them, but that's where we get this personal pronoun. That's why the superior court in this case did exactly what they did. They were following what Gray said would be okay. So is it your position that as long as you do that, it doesn't matter at all, you know, how close in it is that somebody is going to know exactly who you're talking about? Right. Because the other thing that's ridiculous about it is that the more other evidence there is, how could it ever be harmful? I mean, the corollary of the more inferential evidence there is, that's in theory, that's the most serious. I mean, according to counsel, that's the more egregious. But it's absolutely harmless for the same reason. What about the point, which seemed fairly transient to me, that this information really wasn't pertinent to the guilt of the speaker? So it's going to be particularly unlikely that the jury is going to try and prove him guilty. It's not going to be used to prove him guilty. It's particular information. And what about dropping people off? I think that that's — I totally disagree. I think that what you're trying to do when you're presenting this evidence as to the speaker's guilt is that you're going to have to overall give credibility to the victim's testimony of how things happened, to explain to the jury why did they show up in front of some people and not others. But this has nothing to do with the victim. I mean, the question of whether they dropped somebody off. If they were talking about the actual crime, yes, you'd be right. But they're not talking about the actual crime. He's talking about things that happened after the crime that have nothing to do with his guilt and that don't seem to have any particular function other than an inferential incrimination of the defendant. Well, I mean, I think that, you know, the prosecutor admitted that it was a misstatement to say what about this redaction. And I'm not saying — I mean, they had an agreement. I'm not talking about that statement. I'm talking about the sentence that the redaction was about, i.e., I dropped off somebody and then I dropped off somebody else. I think that — I mean, are we saying — like, I don't think there's any — I don't think Bruton is limited that you can only bring in what the defendant said about himself. But the more you don't, the more it becomes — the excuse for doing it to begin with is essentially that it's a statement against penal interest when it isn't one. And that's more questionable. Well, it's not a — it's an admission. It's not just a statement against penal interest. So it comes in as an admission in its entirety, right? I mean, that's — and the only thing Bruton is concerned about is how do we keep the jury following that instruction that says just apply his admissions to him? Let me just ask a factual question. I gather, though, it is true that there were two drop-offs, that the statement was that there were two drop-offs, in fact. And so when you say, well, they fixed it by showing that one of them was this Anwu guy, that didn't really deal with the other one. Well, one of the things I wanted to just point out is that the actual colloquy was this. The prosecutor said in trying to make good on this and make clear that the redaction he was referring to was not to one of the co-defendants. He says, McLaren — Detective McLaren, I want to clarify one question I asked you the other day. You talked about — we were talking about the statement, I believe, of Nguyen. Yes. And at some point you said he told you that he came back to Cao Cao's place, left and left again. Do you remember that? Yes. I asked you what he did in between those two leavings. Correct? Yes. And you testified that he went to drop someone off. Do you remember that? Yes. Who did they go to drop off? Right. A man named An. Yeah. But was there also testimony that he dropped somebody else off? There was not — I think that the way that they — the way the question came out is that there were leavings and goings, and I don't think that this was about, like, the testimony was not — okay, so first you made one drop off. Well, that's what I've been trying to find out. And then you came back. And then you went and took somebody else somewhere. Is that correct? Is this actual testimony in the record? Yes. In our excerpts someplace? I don't believe that the testimony is in the excerpts, no. It's in the — it is in the record, though. Okay. So I think that if there was any concern that the jury thought, oh, it must be FAM because — I mean, I think that the problem in this is not the jury's inferring that it's — Your ultimate argument, as I understand it, is that that doesn't matter. I really don't think it does. Even if they were thinking that must be FAM, they didn't say it was FAM, and they didn't say redacted, and the Supreme Court says that's fine. I mean, that's basically your position. Right. And I also just think that going back to — you know, on this, I really do think that this is a dead case, that, you know, you have out of the seven — it looks like there were about seven guys that went and did this. You know, you have three of them who made statements admitting their culpability, and yet some of them came back in and testified and said, no, no, I didn't mean that. And I do think that the testimony of the victims is quite strong. All right. Are there any other issues you want to argue about? The accomplice testimony was the other one. Accomplice testimony, there's no Federal question. I mean, this Court just held that last year, that there's no Federal question on — and cool is — this Court distinguished cool and said it's an opposite, and it is. And I think my brief makes really clear why that is. The California Supreme Court has subsequently, you know, come to a different answer on that. California gives defendants a lot of extra benefits, I would argue. But, no, it's not a Federal question, and it was a — if anything, it was an error of — I mean, it wasn't an error because it was not requested and there was no sui spani duty, but it's a matter of State law. But you're not arguing procedural default on the question? I'm not arguing procedural default, no. If there are any further questions, otherwise I would stop. Thank you. Thank you, counsel. I think you're out of time, but I'm not sure about that. Do you have time left? If that's one minute and 34 seconds of positive time, come use it if you want to. Oh, it's negative time, but come use it anyway. You can have it. Thank you very much. It's always been a pleasure to be here, I'd say that. First on the IAC — You ought to really reconsider this retirement. I think you're at the top of your game. Thank you very much, Your Honor. First on the IAC issue, counsel has argued valiantly in terms of the credibility of my client and the trial counsel and so forth. And, of course, there's been no hearing on it. And if you believe the papers, as you're supposed to, it's like a demurrer. Trial counsel was told about the landlord, didn't go visit the landlord because he thought the landlord didn't want to be involved. And that was the only alibi. I did want to answer the questions concerning what the Supreme Court has said. The — this Court, as I cite on page 26 of my brief in Mayfield, had a case where there was a redaction, and instead of saying the person's name, they said an individual. But the problem is the details that came in through that statement in conjunction with all the evidence that preceded it. So anyone knowing when they introduced this and what came before it, it would point at the co-defendant. And this Court reversed. Which case was that? Mayfield. U.S. v. Mayfield, 189 F. 3rd, 895, 1999. It's on my brief on page 26. And this Court, the Ninth Circuit, emphasized that the invisible imprints were unavoidable. That's how the Court stated it. If not on its face, then certainly in the contents of the previously admitted evidence at trial. And I think counsel is absolutely wrong in terms of the Richardson case. The Richardson case said when the redacted statement was admitted, it was absolutely neutral concerning the evidence that came in before it. It was only afterward where no one had a crystal ball. But I absolutely can't understand why that could matter. The jury isn't going to decide anything by afterwards or before. It's going to go at the end of the case and decide based on the whole record. It doesn't make any sense. Well, to my mind, it does make sense. And in our case, it's perfect. You have basically all the evidence in except for McLaren's statement about Nguyen. And so both the trial court and the prosecutors can say to themselves, okay, in light of what came in, is this redacted enough so that the existence of a defendant is gone? Am I only going after Nguyen, or is he going to say something that implicates a defendant in light of what came before it? And if so, it can't come in. That's what Richardson is saying. Well, that's sort of a practical issue. Well, and again, that's what the trial court's supposed to do. Let me ask you one last question. Yes. What about your opposing counsel's statement that the accomplice issue isn't a Federal question? That sort of seems right to me. Why is it a Federal question? Oh, I think it is a Federal question. Why? Why is the accomplice issue? Why is it a Federal question? Well, I think, in my view, what we have here is a structural error. And from the defense point of view, it's a structural error because what we did was we lowered the prosecution's burdens. We said that all the in-court favorable testimony to Pham should be distrusted. But the out-of-court statements testified to by cops, those out-of-court statements, we didn't say those had to be distrusted. And that violates Ingray-Winship. That lowers the prosecution's burden of proof. So clearly, it's a due process issue, in my view, as I say. Is there a Ninth Circuit case for the contrary, as she suggests? There are three cases that I cite. Nothing that is exactly on point. It's just the force and logic of all those cases, Your Honor. All right. Thank you very much. And thank both of you for a very useful argument. Okay. Thank you, Your Honors. The case of United States v. Pham, not United States v. Pham, Pham v. Hickman is submitted and will be in recess until tomorrow morning. Thank you.
judges: Berzon, Bea, Gibson